BGK:MJC
F.#2021V00670

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

        Plaintiff,

  -against-

ANY AND ALL VIRTUAL CURRENCY ON
DEPOSIT IN A XAPO, INC. ACCOUNT
WITH USER ID 9488645, WALLET ID:
15891718 WITH WALLET ADDRESS:
3AfXiK8errg2WffF4PCwKkPUwMVQfcB9GK,
HELD IN THE NAME OF ERNESTO PLAZA
VERNAZA, WITH ASSOCIATED EMAIL
ADDRESS ernestoplazavernaza07@gmail.com,
AND ALL PROCEEDS TRACEABLE
THERETO,

        Defendant *in rem*

- - - - - - - - - - - - - - - - - - - - - - -X

VERIFIED COMPLAINT
<u>IN REM</u>

Civil Action No:

      Plaintiff, the United States of America, by its attorneys, JOSEPH NOCELLA, JR., United States Attorney for the Eastern District of New York and Michael J. Castiglione, Assistant United States Attorney, of counsel, alleges upon information and belief as follows.

## **PRELIMINARY STATEMENT**

    1.    The United States of America brings this civil action *in rem* to forfeit and condemn to the exclusive use and benefit of the United States the above-captioned Defendant *in rem* and all proceeds traceable thereto, pursuant to: (a) Title 21, United States Code, Section 881(a)(6), as moneys furnished in exchange for a controlled substance, in violation of Title 21, United States Code, Section 841, or proceeds traceable thereto; and (b)

Title 18, United States Code, Section 981(a)(1)(A), as property involved in money laundering or attempted money laundering of narcotics proceeds, in violation of Title 18, United States Code, Section 1956, or proceeds traceable thereto.

## JURISDICTION AND VENUE

2. This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in the Eastern District of New York pursuant to 28 U.S.C. §§ 1355 and 1395, in that acts and omissions giving rise to the forfeiture occurred in Eastern District of New York.

## THE DEFENDANTS *IN REM*

4. The Defendant *in rem* consists of any and all virtual currency on deposit in a XAPO, Inc. account with user ID 9488645, Wallet ID: 15891718 with Wallet address: 3AfXiK8errg2WffF4PCwKkPUwMVQfcB9GK, held in the name of Ernesto Plaza Vernaza, with associated email address ernestoplazavernaza07@gmail.com, and all proceeds traceable thereto (hereafter, the "Defendant Account").

## STATUTORY BACKGROUND

5. Pursuant to Title 21, United States Code, Section 881(a)(6), all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance, or proceeds traceable to such an exchange, are subject to forfeiture to the United States.

6. Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1956(h) prohibit any person knowing that the property involved in a financial transaction represents

proceeds of some form of unlawful activity, to conduct or attempt to conduct, a financial transaction which in fact involves the proceeds of specified unlawful activity knowing that the transaction is designed in whole or in part to conceal or disguise, the nature, the location, the source or the ownership or the control of the proceeds of specified unlawful activity, or to conspire to commit such an offense.

7. Title 18, United States Code, Section 981(a)(1)(A) provides for the forfeiture of all property, real or personal, involved in a money laundering transaction or attempted money laundering transaction, in violation of Title 18, United States Code, Section 1956, or any property traceable to such property.

## BACKGROUND ON BITCOIN

8. Bitcoin[1] is a type of virtual currency, circulated over the Internet. Bitcoin are not issued by any government, bank, or company, but rather are controlled through computer software operating via a decentralized, peer-to-peer network. Bitcoin is just one of many varieties of virtual currency.

9. Bitcoin are sent to and received from Bitcoin "addresses." A Bitcoin address is somewhat analogous to a bank account number and is represented as a case-sensitive string of letters and numbers of a specified length. Each Bitcoin address is controlled through the use of a unique corresponding private key. This key is the equivalent of a password, or PIN, and is necessary to access the funds associated with a Bitcoin address. Only the holder

---

[1] Since Bitcoin is both a currency and a protocol, capitalization differs. Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and "bitcoin" (with a lowercase letter b) to label units of the currency. That practice is adopted here.

of an address' private key can authorize transfers of bitcoin from that address to other Bitcoin addresses. Users can operate multiple Bitcoin addresses at any given time and may use a unique Bitcoin address for each and every transaction.

10. To acquire bitcoin, a typical user purchases them from a virtual currency exchange. A virtual currency exchange is a business that allows customers to trade virtual currencies for other virtual currencies or other forms of value, such as conventional fiat money (e.g., U.S. dollars, Russian rubles, euros). Exchanges can be brick-and-mortar businesses (exchanging traditional payment methods and virtual currencies) or online businesses (exchanging electronically transferred money and virtual currencies). Virtual currency exchanges doing business in the United States are regulated under the Bank Secrecy Act and must collect identifying information about their customers and verify their clients' identities.

11. To transfer bitcoin to another Bitcoin address, the sender transmits a transaction announcement, which is electronically signed with the sender's private key, across the peer-to-peer Bitcoin network. To complete a transaction, a sender needs only the Bitcoin address of the receiving party and the sender's own private key. This information on its own rarely reflects any identifying information about either the sender or the recipient. As a result, little-to-no personally identifiable information about the sender or recipient is transmitted in a Bitcoin transaction itself. Once the sender's transaction announcement is verified by the network, the transaction is added to the blockchain, a decentralized public ledger that records every Bitcoin transaction. The blockchain logs every Bitcoin address that has ever received bitcoin and maintains records of every transaction for each Bitcoin address.

4

12. While a Bitcoin address owner's identity is generally anonymous within the blockchain (unless the owner opts to make information about the owner's Bitcoin address publicly available), investigators can use the blockchain to identify the owner of a particular Bitcoin address. Because the blockchain serves as a searchable public ledger of every Bitcoin transaction, investigators can trace transactions to, among other recipients, Bitcoin exchangers. Because Bitcoin exchangers generally collect identifying information about their customers, as discussed above, subpoenas or other appropriate legal process submitted to exchangers can, in some instances, reveal the true identity of an individual responsible for a Bitcoin transaction.

## **THE INVESTIGATION**

13. Since in or about 2009, the Drug Enforcement Administration ("DEA") began an investigation into individuals involved in the laundering of narcotics proceeds. Law enforcement utilized several confidential sources (the "Sources"), who have been acting in an undercover capacity while targeting major narcotics/money laundering networks based in Colombia and Mexico.

14. The Sources have infiltrated various networks of money launderers and money brokers in the United States, Colombia and Mexico who are affiliated with a Drug Trafficking Organization ("DTO") based in Cali, Colombia, identified as the Pecoso Drug Trafficking Organization (the "Pecoso DTO"). Based on information obtained during the course of this investigation which includes, the undercover operation, information obtained from the Sources and conversations with other law enforcement officers, the Pecoso DTO, along with the Sinaloa Cartel, are responsible for exporting large quantities of illegal narcotics, primarily cocaine, into the United States from Colombia and Mexico. After the narcotics are

distributed in the United States, the cartels collect and launder the proceeds generated by the sale of the narcotics.

15. During the course of the investigation, the Sources have negotiated directly, through various money broker networks, with the cartels to collect and launder large sums of illegal proceeds in the New York City area, including in the Eastern District of New York, and elsewhere. In addition, through the undercover operation, the Sources have arranged for the collection of narcotics proceeds through a number of money brokers working with the cartels (collectively, the "Brokers").

16. During the undercover operation, it was established that, in exchange for a percentage of the proceeds laundered ("commission"), either the Sources or the undercover law enforcement officers would, at the direction of a money broker: (a) arrange for the pick-up of illegal proceeds in the United States and elsewhere; (b) deposit the illegal proceeds into the undercover bank account; and (c) conduct a wire transfer of the illegal proceeds to designated business and personal accounts at the direction of one of the Brokers.

17. Specifically, between in or about 2009 and in or about November 2020, in excess of $19 million in illegal drug trafficking proceeds was collected and laundered on behalf of the Cartels through the undercover operation via wire transfers to domestic and overseas accounts.

18. The investigation has revealed that the Cartels used methods commonly employed by money laundering organizations to transfer narcotics proceeds. These methods, intended to conceal or disguise the true source and intended use of the proceeds, include the following:

   a. The Brokers contacted the undercover agents or the Sources and gave them telephone numbers of money couriers and the "safe codes" to be used to arrange for the pick-up of the funds;

   b. The paid a commission of between two percent (2%) and sixteen percent (16%) of the total amount of funds, which were picked up and transferred based on a negotiated rate;

   c. The physical transfer of large amounts of currency to undercover agents and/or the Sources from the money couriers generally occurred in public places, such as busy streets, parking lots or shopping malls. At times, the money couriers delivering the proceeds retrieved them from electronic hidden compartments in their vehicles. The use of hidden compartments is a counter-detection method commonly used by narcotics trafficking organizations to hide contraband and/or proceeds of the illegal conducted;

   d. The currency was wrapped in plastic heat-sealed bags or heavily perfumed packaging to mask the odor of narcotics. Currency was also wrapped with rubber bands and/or stored in shoe boxes inside large shopping bags;

   e. The wire transfer instructions that were provided directly to the undercover agents and/or the Sources by the Brokers were consistent with layering methods used by money launderers to conceal the source and final destination of the funds. Indeed, large amounts of currency were received as part of the pick-up operations and the undercover agents and/or the Sources were instructed to separate these large amounts of currency into smaller amounts to be wire transferred to multiple accounts;

   f. During the transactions involved in this investigation, the undercover agents and/or Sources had multiple telephone communications with the Brokers and their associates regarding the pick-up of the illegal proceeds, the transportation of the illegal proceeds, and the ultimate transfer of the illegal proceeds from the undercover bank account to destinations identified by the Brokers; and

   g. Upon the completion of each of the wire transfers, the undercover agents and/or the Sources were required to call or email the Brokers with confirmation of the wire transfers, which identified the banks from which the transfer of funds originated.

   19. During the course of the undercover operation, on January 24, 2018, law enforcement arranged for the pickup, through a Broker, of drug proceeds in Boston, Massachusetts. On this date, law enforcement picked up a bag containing $100,895. Thereafter, this money was then deposited into a DEA undercover bank account (hereafter, "DEA Account #1"), which is maintained in New York, New York.

   20. During the course of the undercover operation, on January 24, 2018, law enforcement also arranged, through a Broker, for the pickup of drug proceeds in Chicago, Illinois. On this date, law enforcement picked up a bag containing $61,610. This currency was also deposited into DEA Account #1.

   21. On January 25, 2018 law enforcement transferred $162,025 from DEA Account #1 to a second DEA Undercover Account (hereafter, DEA Account #2) in Brooklyn, NY. This transaction was a combined transfer which included the funds picked up in Boston, Massachusetts and the funds picked up in Chicago, Illinois.

22. On January 30, 2018, based on instructions received from the Brokers, law enforcement transferred $153,216 from DEA Account #2 to a DEA Undercover Coinbase Account (hereafter, "DEA Coinbase Account") in exchange for 13.4843 Bitcoin ("BTC"). This transaction was a combined transfer which included the $100,895 of funds picked up in Boston, MA and the $61,610 picked up in Chicago, IL on January 24, 2018, less commissions of $9,289.00.

23. On March 6, 2018, law enforcement transferred 13.02962468 BTC from the DEA Coinbase Account to the Defendant Account as instructed by a Source.

24. The Defendant Account was established by a Source at XAPO, Inc. on or about March 2, 2018, utilizing the fictitious name of Ernesto Plaza Vemaza. This account was established for the purpose of laundering the illegal funds by a Source at the direction and supervision of federal law enforcement agents. The 13.02962468 BTC currently remains in the Defendant Account.

25. On or about May 19, 2021, the Honorable Ramon E. Reyes, United States Magistrate for the Eastern District of New York issued a seizure warrant for the Defendant Account, finding probable cause to believe that the Defendant Account contained moneys furnished in exchange for a controlled substance in violation of federal narcotics laws or proceeds traceable to such an exchange in violation of 21 United States Code, Section 881(a)(6) and/or property involved in money laundering in violation of 18 U.S.C. § 1956.

**FIRST CLAIM FOR RELIEF**

26. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 25 as if fully set forth herein.

9

27. The Defendant Account constitutes moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of 21 U.S.C. §§ 801, et seq., or proceeds traceable to such an exchange.

28. As such, the Defendant Account is subject to forfeiture to the United States, pursuant to 18 U.S.C. § 881(a)(6).

## SECOND CLAIM FOR RELIEF

29. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 25 as if fully set forth herein.

30. The Defendant Account represents property involved in a transaction or attempted transaction of money laundering in violation of 18 U.S.C. § 1956 or property traceable to such property.

31. As such, the Defendant Account is subject to forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A).

WHEREFORE, Plaintiff, United States of America, requests that the Clerk of the Court issue a warrant for the arrest of the Defendant Account, that notice of these proceedings be given to all interested persons; that the Defendant Account be forfeited and condemned to the use of the United States of America; that the Plaintiff be awarded its costs

and disbursements in this action and for such other and further relief as this Court deems just and proper.

Dated: Brooklyn, New York
      July 25, 2025

                                  JOSEPH NOCELLA, JR.
                                  UNITED STATES ATTORNEY
                                  *Attorney for Plaintiff*
                                  Eastern District of New York
                                  271 Cadman Plaza East
                                  Brooklyn, New York  11201

By: _____
        Michael J. Castiglione
        Assistant United States Attorney
        (718) 254-7533

# **VERIFICATION**

Ryann Carr hereby declares as follows:

1. I am a Special Agent with the Internal Revenue Service.

2. I have read the verified complaint <u>in rem</u> in this action and know the contents thereof.

3. The matters contained in the within verified complaint <u>in rem</u> are true and accurate to the best of my knowledge, information and belief.

4. The source of my information and the grounds for my belief are my personal knowledge, information provided by other law enforcement officers, and the official files and records of the Internal Revenue Service and other law enforcement agencies.

I declare under penalty of perjury that the foregoing is true, to the best of my knowledge, information, and belief.

Dated: Brooklyn, New York
July 25, 2025

_____
Ryann Carr
Special Agent
Internal Revenue Service